[No. F012645. Fifth Dist. Jan. 30, 1991.]

LIQUID CHEMICAL CORPORATION et al., Plaintiffs and Appellants, v.
DEPARTMENT OF HEALTH SERVICES, Defendant and Respondent.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I of the Discussion.

1684

COUNSEL

Maroot, Hardcastle & Hatherley and V. Wayne Hardcastle for Plaintiffs and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, and Timothy R. Patterson, Deputy Attorney General, for Defendant and Respondent.

OPINION

**VARTABEDIAN, J.**—We are called upon to determine the propriety of an enforcement action taken by the State of California acting through its Department of Health Services (DHS) under provisions of the California Hazardous Waste Control Act (HWCA) which took effect on January 1, 1987. Specifically, appellants, Liquid Chemical Corporation (LCC) and Donald Garrett, claim DHS lacked jurisdiction because rules and regulations applied against them were not lawfully adopted and/or appellants' materials in question are not "hazardous waste." Garrett additionally contends that he should not be personally liable. We reject each of these claims and affirm the superior court judgment.

## Factual and Procedural Background

LCC's facility is located in an industrial park a few miles south of Hanford, California. The site contains six surface impoundments (storage ponds), digesters, a granulator, office space, drum storage, storage bins and unused land. ■■ ■■ ■■ ■■ LCC is in the business of manufacturing liquid and granular micronutrient[1] fertilizer.

Garrett's educational background includes a doctorate in chemical engineering. He has been president of LCC since 1980 when he bought out the corporate shares held by other officers. Although his testimony was rather ambiguous, it appears that the corporation currently has only three shareholders.

Before 1985, steel mill flue dust was the major raw material used by LCC. That dust results from a process wherein scrap iron is melted in furnaces. It resolidifies into small particles that are captured in an emission control device. LCC manufactured zinc sulfate from the steel mill flue dust by putting it into sulfuric acid. The leftover liquid from the manufacturing process was sent to the storage ponds located at the site.

Steel mill flue dust was designated a hazardous waste in 1985 by the federal Environmental Protection Agency (EPA) and given the reference code number K016. ■■ ■■■■ Each of LCC's 6 ponds contains K016 slurry.[2] The slurry is about 10 percent zinc, 1.7 percent lead, .10 percent cadmium, and .10 to .20 percent copper by dry weight. A total estimated 30,000 tons of material are contained in the 6 ponds.

Since 1985, LCC has used sal skimmings, galvanizer's ash, ball mill fines, filter cake, zinc hydroxide, and zinc baghouse flue dust as its raw materials. Most of these result from practices in the galvanizing industry.

■■ Galvanizing is a process by which metal, usually steel or iron, is plated or coated with zinc to protect the base metal from rust or corrosion when exposed to air or water. The "hot dip" method is the most popular method of galvanizing used in the United States. Molten zinc, with a temperature of about 850 degrees Fahrenheit, is contained in a kettle. Floating on top of the molten zinc is a flux solution, usually ammonium chloride or

---

[1] Micronutrients are "any of the chemical elements, as iron, required in minute quantities for growth of an organism." (Webster's New World Dict. (2d college ed. 1982) p. 898.)

[2] Slurry is a "thin watery mixture of a fine, insoluble material, as clay, cement, soil, etc." (Webster's New World Dict., *supra*, p. 1343.)

zinc ammonium chloride. The base metal is put through the flux, which cleans and prepares the surface of the metal to accept the zinc coating.

After a number of pieces of material are put through the flux and the zinc in that fashion, some of the zinc becomes mixed in with the flux. The flux becomes sluggish because of picking up portions of the zinc, dirt, or other impurities from the metal, and because the ammonium chloride changes its chemical composition when it comes into contact with the air. The flux is then skimmed off, resulting in what is referred to in the trade as sal skimmings.

Galvanizer's ash, also called zinc ash, zinc oxide or zinc top dross, is another byproduct of the steel galvanizing process. When the kettle that contains the flux and the zinc is skimmed, it causes oxidation and a certain amount of ash generates on the kettle.

Galvanizer's ash is sometimes crushed to recover the metallic zinc content. After the metallic zinc is removed, oxidic zinc is left. This is called ball mill fines or ball mill ash.

In the hot dip method of galvanizing, before the metal is placed into the zinc, it passes through a "pickle liquor" of sulfuric acid. Zinc hydroxide is produced when the metal content of that solution is removed.

When zinc is applied by electroplating, the base metal is placed into a zinc acid solution. Filter cake is produced from the rinse waters through the electroplating system. It is approximately 8 to 15 percent zinc.

Zinc baghouse dust results from the melting of scrap metal. The fumes are primarily zinc oxide. They are collected in a baghouse.[3]

The materials used to manufacture the fertilizer all contain some lead as well as the zinc. The ball mill fines contain the most zinc.

LCC puts the sal skimmings or other raw materials into sulfuric acid to dissolve the various zinc raw materials coming in and converts them to zinc sulfate. "Converting" is a chemical reaction.

The diluted zinc from the ball mill fines is put into the storage ponds.

---

[3] A baghouse is a building in which bag filters are used for filtering gas. (Webster's 3d New Internat. Dict. (1986) p. 162.)

In 1987, a corrective action order and complaint for penalty was issued by the DHS. The second amended complaint charged LCC and Garrett with 10 violations of the Health and Safety Code or of the California Administrative Code,[4] specifically:

(1) Violations of Health and Safety Code sections 25154 and 25200.5, title 22, California Administrative Code, section 66389, and LCC's interim status document section 1, paragraph 4, and section 2, paragraphs (a)(1) and (b), by storing, treating and disposing of hazardous waste without a permit and without the payment of appropriate fees.

(2) Violations of title 22, California Administrative Code, section 66515, importing hazardous waste from Canada and Mexico without notifying the DHS and without filing the required manifests.

(3) Violation of title 22, California Administrative Code, section 67166, and section 7, paragraphs 2 and 5 of LCC's interim status document, by receiving hazardous waste from within California without notifying the DHS and without filing the required manifests.

(4) Violation of title 22, California Administrative Code, section 67003, by failing to provide for financial assurance for closure of the facility.

(5) Violation of title 22, California Administrative Code, section 67027, by failing to obtain and maintain liability insurance.

(6) Violation of title 22, California Administrative Code, section 67015, by failing to provide financial assurance for postclosure care.

(7) Violation of title 22, California Administrative Code, section 67212, subdivision (a), by failing to submit an adequate closure plan.

(8) Violation of title 22, California Administrative Code, section 67310, by failing to maintain two feet of freeboard in their surface impoundments.

(9) Violation of title 22, California Administrative Code, section 67191 and 40 Code of Federal Regulations section 265(f), by failing to meet ground water monitoring requirements.

(10) Violation of title 22, California Administrative Code section 66391, by submitting an application that was not properly certified.

---

[4] Regulations formerly found in title 22 of the California Administrative Code are now contained in title 26, Toxics, of the California Code of Regulations.

The corrective action order and complaint for civil penalties set forth a schedule of compliance with the appropriate regulations, set a civil penalty of $250,000, and notified appellants of the right to a hearing on the corrective action and the civil penalty assessment.

Following a 10-day hearing in 1988, the administrative law judge ruled in favor of DHS and imposed the $250,000 civil penalty against both LCC and Garrett. The administrative law judge set out each charge and found cause for upholding each alleged violation.

Seeking review of the administrative decision, LCC and Garrett filed a petition for writ of mandate in the Superior Court of Kings County. The superior court reviewed the decision and, after a two-day hearing, found that the record supported the administrative law judge's determination under either the substantial evidence test or the independent judgment test. This appeal challenges the superior court judgment denying appellants' petition.

DISCUSSION

I.

*Standard of Review**

. . . . . . . . . . . . . . . . . . . . . . . .

II.

*Validity of Laws Applied*

A.

*Effect of State's "Interim Authorization" and Federal Law*

■ Appellants argue DHS does not have jurisdiction because its "interim authorization" is no longer valid. The federal Resource Conservation and Recovery Act (RCRA) (found at 42 U.S.C. § 6921 et seq.) sets forth provisions allowing a state to operate under the EPA requirements in that particular state.

---

*See footnote, *ante,* page 1682.

Title 42 United State Code section 6926 provides that a state wishing to administer and enforce a hazardous waste program under RCRA may apply to the EPA administrator for authorization. The administrator may grant the state the authority to operate its program "in lieu" of the federal RCRA program.

California received partial interim authorization on June 4, 1981 and 1983, but that authorization expired on January 31, 1986. (51 Fed.Reg. 4128 (Jan. 31, 1986).)

This interim authorization specifically did not include permitting authority with respect to: (1) treatment of hazardous wastes in surface impoundments, waste piles, land treatment facilities, or incinerators; (2) storage of hazardous wastes in surface impoundments or waste piles; or (3) disposal facilities. (50 Fed.Reg. 5259.)

Title 42 United States Code section 6929 provides in relevant part, "Upon the effective date of regulations under this subchapter no State or political subdivision may impose any requirements less stringent than those authorized under this subchapter . . . . Nothing in this title shall be construed to prohibit any State . . . from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations."

No part of the California hazardous waste program is presently authorized under RCRA. While the "interim authorization" was in effect, the DHS did work in conjunction with the EPA to coordinate their programs. However, the lapse of the federal authorization to operate the state program in lieu of the federal program did not destroy the authority of the DHS to continue operating its own state mandated program.

The notification of the expiration of the interim authorization in the Federal Register specifically provided, "The State programs will continue in effect under State legal authorities." (51 Fed.Reg. 4128 (Jan. 31, 1986).)

Thus, the RCRA program is not what is being enforced here. The independent state program is what appellants are charged with having violated. The concept of interim authorization then is irrelevant to the questions before this court. The only exception to this is the charge alleging violation of 40 Code of Federal Regulations section 265(f) (charge 9), concerning federal requirements for ground water monitoring. However, that charge

was also based on an independent state ground, former title 22, California Administrative Code, section 67191, so any lack of state authority to enforce the federal requirements does not change the result on that charge.

As a corollary to the argument that DHS lacked interim federal authorization, appellants assert, "Since RCRA formed the basis for CHWCA [California Hazardous Waste Control Act], Appellant believes that it *is* relevant to see if federal law is being followed, expanded upon, or simply disregarded as in the instant case as if it did not exist." While we agree that case law interpreting federal statutes which are analogous to particular provisions of HWCA are helpful, mere compliance with federal requirements does not shield a party from the more stringent provisions of HWCA.

Appellants cite *McClellan Eco. Seepage Situation* v. *Weinberger* (E.D.Cal. 1986) 655 F.Supp. 601 in support of its argument that DHS has no jurisdiction to bring this action since it had lost its interim status under RCRA. However, that case was a taxpayers' lawsuit brought specifically under RCRA. The complaint alleged that McClellan Air Force Base had violated certain provisions of the RCRA. Plaintiffs sought civil penalties. The court stated "This matter involves an issue of sovereign immunity," noting that the United States Government cannot be sued without its consent. The court looked for consent to be sued in the form of a waiver of sovereign immunity for civil penalties. It found none and dismissed the portion of the complaint praying for civil penalties. (*Id*. at p. 602.) There is no discussion regarding California's interim status in the case.

*McClellan Ecological Seepage* v. *Weinberger* (E.D.Cal. 1988) 707 F.Supp. 1182 does contain a discussion of California's interim status under RCRA. In that case, the same taxpayers involved in the prior suit alleged numerous causes of action against McClellan Air Force Base for violation of provisions of the RCRA and the California Health and Safety Code for generation, treatment and disposal of hazardous waste at the federal facility. Specifically they alleged violations of Health and Safety Code sections 25201, 25154, 25155, and 25203. The government contended that those causes of action should be dismissed for lack of jurisdiction under the RCRA citizen-suit provision, arguing that the obligations alleged to have been violated were not effective pursuant to RCRA.

The court agreed, saying, "A state statute could arguably have become effective pursuant to RCRA if it is part of a state hazardous waste program that has been authorized by EPA under section 3006 of RCRA, 42 U.S.C. § 6926, to apply in lieu of the federal hazardous waste program . . . . [¶]

. . . [¶] Because California's interim authorization has expired, that state's hazardous waste laws are not even arguably 'effective pursuant to [RCRA].' [Citation.] Indeed, California never had authorization with respect to most of the provisions involved [in the complaint]. Under these circumstances, the violations of state statutory provisions alleged by MESS cannot be reviewed in the context of a citizen suit under RCRA § 7002." (*McClellan Ecological Seepage* v. *Weinberger, supra,* 707 F.Supp. at pp. 1190-1191, fn. omitted.)

The instant case, however, is not a citizen suit and it was not brought under the authority of the RCRA but under HWCA. It is an enforcement action specifically authorized pursuant to California Health and Safety Code section 25189.3.

Thus neither *McClellan* case establishes that the provisions of state law may not be enforced by the state agency designated as the enforcement agency in the enactment. The 1988 *McClellan* decision simply states that such provisions are not effective in an action brought pursuant to RCRA.

In *Acme Fill Corp.* v. *Reilly* (N.D.Cal. 1990) 735 F.Supp. 353, an owner and operator of a landfill facility filed a petition in federal court for review of a closure plan approved by the EPA and DHS. DHS moved to dismiss on the basis of lack of federal jurisdiction. The petition was granted. Petitioner had argued that since the EPA and DHS agreed to jointly administer the closure plan approval process, such joint action conferred federal subject matter jurisdiction " 'over the actions of the State Defendants with respect to the State's role in processing, evaluating and approving Plaintiff's Closure plan, applying federal laws and standards on behalf of and in conjunction with EPA.' " (*Id.* at p. 355.)

The court disagreed, noting: "[DHS] clearly has independent jurisdiction over plaintiff's facility and operations. This is provided for in the first instance by 42 U.S.C. §§ 6926 and 6929 which provide federal authorization for states to administer and enforce hazardous waste programs so long as the rules respecting operation of those programs are not less stringent than and are compatible with the federal regulatory scheme. The California Legislature adopted the standards of the EPA and authorized the state agency to adopt standards consistent with the federal standards as far as practicable but allowed for more stringent and extensive ones as well. Cal.Health and Safety Code § 25159.5." (*Acme Fill Corp.* v. *Reilly, supra,* 735 F.Supp. at p. 355.)

The California statutes found at Health and Safety Code section 25100 et seq. comprise the statutory scheme being enforced in the case here not the federal requirements of RCRA. As such, the state has jurisdiction over this matter.

B.

*Effect of "Regulations" Not Adopted Pursuant to the California Administrative Procedure Act*

■ Three of the state's exhibits are challenged as constituting invalid and unenforceable regulations, specifically exhibits 115, 141 and 142—a flow chart, a diagram and a memo.

Appellants point out accurately that the provisions of the California Administrative Procedure Act (Gov. Code, § 11370 et seq.) govern the adoption of any regulation. "Regulation" is defined in section 11342, subdivision (b) of the Government Code as follows: "[E]very rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agency." (See Gov. Code, § 11347.5, subd. (a).)

Without citation to any authority, appellants state that regulations not promulgated in compliance with the California Administrative Procedure Act are invalid and unenforceable. Additionally, appellants overstate their case when they represent, "Respondent admits that it has promulgated rules by which it determines what is a hazardous waste under CHWCA, and which it admittedly applied against Appellants in this case . . . ."

Apparently appellants are referring to the testimony of David Leu, who is employed by DHS as the chief of alternative technology section within the toxic substances control division. The applied technology program under him is responsible for the classification of hazardous waste. Leu testified that he drafted the flow chart to assist his staff "in having an understanding of what recycling is." Leu did not admit that the flow chart constitutes an improperly passed regulation.

Respondent argues that the exhibits in question are not, nor were they ever intended to be, regulations but were simply utilized internally by DHS.

The trial court determined that the exhibits in question did arguably constitute regulations which had not been adopted as required by the California Administrative Procedure Act. However, it determined the application of any such regulations was a mere "abuse of discretion" that did not prejudice appellants.

The trial court noted, "Independent of any reference or any application of what the court has concluded to be unlawful regulations and the challenged federal regulations, and based solely on existing statutes and unchallenged regulations published in title [now 26] of the California Code of Regulations, not only would the evidence still support the finding that the materials in question were hazardous wastes within the meaning of the statutes, but no other finding is reasonable."

Appellants argue: "The Court below basically concluded that it was not necessary to comply with the APA [Administrative Procedure Act] if the regulations approved in this case were not prejudicial to Appellant." Rather, the court below found that the regulations adopted following the approved procedure supported the actions of the DHS in spite of the fact that certain internal operating reference material should not have risen to the level of regulations.

We thus take a closer look at state's exhibits 115, 141, and 142 and how they relate to the statutes.

Leu identified state's exhibit 115, a flow chart currently in use by DHS. This document aided staff's understanding of the meaning of recycling in the context of whether a substance is hazardous waste.

The first three pages of the exhibit show the process DHS uses to determine if a material is a waste, if it is hazardous waste, and if it is recyclable and qualified for exemptions.

The flow chart refers to the statutes and to how the statutes define waste. It defines residue as, "The material remaining at the end of a process, as after evaporation, combustion, filtration, etc." Leu testified that the definition of residue was taken from Webster's New World Dictionary (1974). Health and Safety Code section 25117 is the source for the definition of hazardous waste.

Regarding exhibit 115, the trial court determined: "[I]t appears to be a standard of general application adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it."

The memo, state's exhibit 141, was described by Leu as a model showing the relationship between products, residuals, and byproducts. The definition of byproduct was taken from 40 Code of Federal Regulations, section 261.1(c)(3). The definition of residual was taken from Webster's Third New International Dictionary.

Leu testified that he had put together exhibit 141 after the trial started but that DHS's interpretation of the terms contained in that exhibit was made when the EPA first came out with its definition of byproduct.

Respondent argues that this definition did not have to be readopted since federal regulations are incorporated by reference in Health and Safety Code section 25159.5, subdivision (b). That section provides in its entirety: "Until the state program is granted final authorization by the Environmental Protection Agency pursuant to Section 6926 of Title 42 of the United States Code, all regulations adopted pursuant to the Resource Conservation and Recovery Act of 1976, as amended, (42 U.S.C. Sec. 6901 et seq.) shall be deemed to be the regulations of the department, except that any state statute or regulation which is more stringent or more extensive than a federal regulation shall supersede the federal regulation." (Fn. omitted.)

Thus Health and Safety Code section 25159.5, subdivision (b) provides that regulations adopted pursuant to 42 United States Code section 6926 are deemed state regulations.

Leu identified state's exhibit 142 as a document dealing with the concept of "Used in a Manner Constituting Disposal." He noted that the document "explicitly states the Departments [sic] interpretation of that term.

The trial court noted, "Similarly, exhibit S 142 appears on its face to be a regulation or standard of general application used to interpret the law enforced by the Department."

The exhibits in question were merely illustrative of actual laws and regulations which had been lawfully adopted. The exhibits were not essential to the administrative law judge's finding that appellants had indeed violated the code sections with which they were charged.

Health and Safety Code section 25124 at pertinent times provided in relevant part, " 'Waste' means any of the following: (a) Any material for which no use or reuse is intended and which is to be discarded. (b) Any recyclable material."

At the time the within action was brought, Health and Safety Code section 25120.5 provided in relevant part: " 'Recyclable material' means a hazardous waste that is capable of being recycled and is one of the following: (a) A residue."

Health and Safety Code section 25117 provides that a hazardous waste is a waste which meets any of the criteria for the identification of a hazardous waste adopted by DHS pursuant to Health and Safety Code section 25141. That section provides that the department shall develop and adopt by regulation criteria and guidelines for the identification of hazardous and extremely hazardous wastes.

Such regulations have been adopted and at the time of the administrative hearing were set forth in title 22, chapter 30, articles 9 and 11 of the California Administrative Code. At the time of the hearing, article 9 listed the chemical names of materials that DHS had determined to be hazardous. Article 11 contained specific tests and numeric values that DHS used to determine whether the waste is or is not hazardous.

For zinc, 5,000 milligrams per kilogram is hazardous (1,000 parts per million). Even if the concentration of zinc is less than 1,000 parts per million, it may still be hazardous if it meets the criteria set forth in article 11.

*People* v. *Martin* (1989) 211 Cal.App.3d 699 [259 Cal.Rptr. 770] was a criminal prosecution where Martin was charged with transporting and disposing of hazardous waste in violation of Health and Safety Code section 25189.5, subdivision (c), part of the HWCA. One of Martin's defenses was the statute was unconstitutionally " 'vague, ambiguous and not susceptible to any definition that would have meaning to the average person' " (*People* v. *Martin, supra,* at p. 705), specifically arguing that the term " 'hazardous waste' " as defined by the code " 'lack[s] any common sense basis upon which the average person can determine if they are in violation of the law, and provide[s] absolutely no objective standards or measurements.' " (*Ibid.,* brackets in original.)

The *Martin* court disagreed, saying "These statutory definitions [§§ 25117 and 25124] for those who produce or handle hazardous waste provide adequate notice and adequate standards for enforcement for those who police such businesses. Regulated businesses 'can be expected to consult the relevant legislation in advance of action . . . [and] may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.' [Citation.] . . . [¶] Further, the regulations pro-

mulgated by the Department of Health Services (the department) pursuant to the code contain a list of hundreds of materials designated potentially hazardous, and include mathematical formulas and scientific standards by which hazardous materials are identified (Cal. Code Regs., [former] tit. 22, §§ 66680-66723.) Even though statutes need not be of mathematical certainty [citation], these are." (*People* v. *Martin, supra,* 211 Cal.App.3d 699, 706.)

Thus, a person engaged in the business of handling hazardous waste is responsible for knowing what is considered hazardous waste by resort to the statutes and the regulations. Garrett admitted that he had used K016, which was clearly a hazardous waste, in the manufacture of his micronutrients. Consequently, he had been in the business of handling hazardous waste. He replaced the K016 in his manufacturing process with other materials that were designed to serve a similar purpose in the final product. Even without notification by and continual contact with DHS, Garrett knew or should have known the materials he was using were likely to be regulated.

Even though staff members of DHS might have referred to the flow charts or the memos, they did not need to rely upon those documents to determine what constitutes a hazardous waste. Not unlike the operator of a business which handles hazardous waste, they had available to them the underlying sources defining hazardous waste requirements—the statutes. Appellants were not prejudiced by staff members' review of such documents—the determinations were made based on the statutes.

Appellants finally argue that respondent admitted and the court below found that respondent "has not complied with the requirements of either the APA or the Small Business Regulatory Fairness Act in propounding the regulations which Appellant is charged with having violated." This remark is unfounded. No such concession or finding has been made here.

Appellants were charged with violating sections of the Health and Safety Code and the California Administrative Code. There is no question but that those statutes and regulations were adopted pursuant to applicable requirements.

## III.

### *"Hazardous Waste"*

### A.

### · *The Materials at Issue Constitute Waste*

Even though appellants admitted in an application for insurance in 1985 that their business was "producer of micronutrient fertilizer from hazardous waste metallic residues," they now argue that all the materials sought to be regulated are "products of manufacture" and not "waste."

The trial court concluded, "[W]hether the hazardous materials at issue are hazardous 'wastes' turns not upon whether they are discarded, but on whether they are recyclable. This depends on whether they are 'residues' or 'spent materials' as set forth in section 25120.5(a) and (b)."

Appellants fault the trial court for refusing to follow *American Min. Congress* v. *U.S. E.P.A.* (D.C.Cir. 1987) 824 F.2d 1177 [263 App.D.C. 197], wherein the court stated that the RCRA contains no express inclusion of recyclable material. However, we agree with the trial court that *American Min. Congress* is of no assistance in the instant proceedings.

The *American Min. Congress* court stated: "RCRA is a comprehensive environmental statute under which EPA is granted authority to regulate solid and hazardous wastes." (824 F.2d at p. 1178.)

"RCRA includes two major parts: . . . Under the latter, EPA is directed to promulgate regulations establishing a comprehensive management system. [Citation.] EPA's authority, however, extends only to the regulation of 'hazardous waste.' Because 'hazardous waste' is defined as a subset of 'solid waste' [citation], the scope of EPA's jurisdiction is limited to those materials that constitute 'solid waste.' That pivotal term is defined by RCRA as '. . . and other discarded material, . . .' 42 U.S.C. § 6903(27) . . . . As will become evident, this case turns on the meaning of the phrase 'and other discarded material,' contained in the statute's definitional provisions." (*American Min. Congress, supra*, 824 F.2d 1177, 1179.)

The consolidated cases before the *American Min. Congress* court concerned certain industry practices of using "in-process secondary materials employed in an ongoing manufacturing process." (824 F.2d at p. 1192.) Following an analysis that the court itself acknowledges to be a "mind-

numbing journey through RCRA" (*id.* at p. 1189), the court concluded that the term "and other discarded material" was employed in its ordinary, everyday sense and did not include "in-process secondary materials employed in [an industry's] ongoing manufacturing process" (*id.* at p. 1192).

Neither the administrative law judge nor the trial court nor this court has been called upon to construe a statute that includes the term "and other discarded material." The statutes in question here speak of "recyclables" and "residues." The instant proceeding does not involve "in-process secondary materials employed in [an industry's] ongoing manufacturing process." (*American Min. Congress, supra,* 824 F.2d 1177, 1192.) It is not disputed that LCC purchased raw materials from the galvanizing industry that were of no further use in that industry, transported them to its site and manufactured its final product.

As we have noted, 42 United States Code section 6929 allows states to impose regulations that are "more stringent" than federal requirements.

Health and Safety Code section 25159.5, subdivision (b) provides in relevant part that any state statute or regulation which is more stringent or more extensive than a federal regulation shall supersede the federal regulation contained in the RCRA of 1976, as amended (42 U.S.C. § 6901 et seq.).

Appellants point to Health and Safety Code section 25117.9 which provided, when the section was first added to the code, in part, " 'Non-RCRA hazardous waste' means all hazardous waste regulated in the state, other than that hazardous waste which is subject to regulation by the Environmental Protection Agency pursuant to the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. Sec. 6901 et seq.), in states that are not authorized pursuant to section 6926 of Title 42 of the United States Code. A hazardous waste is presumed to be regulated pursuant to the Resource Conservation and Recovery Act of 1976, unless it is determined, pursuant to regulations adopted by the Department, that the hazardous waste is a non-RCRA hazardous waste. Until the Department adopts regulations to implement this section, a hazardous waste is presumed to be regulated pursuant to the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. Sec. 6901 et seq.), unless the generator of the waste determines that the hazardous waste is not a hazardous waste pursuant to the standards specified in part 261 (commencing with § 261.1) of Subchapter I of Chapter 1 of Title 40 of the Code of Federal Regulations."

We note that section 25117.9 was added to the Health and Safety Code by Statutes of 1988, chapter 1631, section 4, after the enforcement action

was brought and after the administrative hearing was held. Prior thereto, regulations had been adopted pursuant to HWCA and, at the time of the hearing, those regulations were found in former title 22 of the California Administrative Code. The regulations bearing on this case were specifically set out in the corrective action order and complaint for civil penalties. Thus, under California law, the materials in question generally fall into the "waste" category: each is capable of being recycled and is a residue.

## B.

### The Materials at Issue Constitute Hazardous Waste

■ DHS's applied technology program, under David Leu's direction, is responsible for the classification of hazardous waste. Based on information submitted, staff members determine whether materials are waste and whether the wastes are hazardous. A request for classification can come from within DHS or from other departments. Five people work in the "waste evaluation unit." They have a first line supervisor, who has a second line supervisor who is supervised by Leu. Leu works on a day-to-day basis with the first line supervisor and his staff. Leu makes the final determination and signs all classifications.

The evidence that supported the finding that each of the raw materials in question was hazardous waste, in addition to Leu's testimony to that effect, included the following:

*Galvanizer's ash*

Galvanizer's ash is formed when the surface of the molten zinc reacts with the oxygen in the air to form zinc oxide. This is skimmed periodically and contains the zinc oxide and some molten metallic zinc.

James Rosenkranz testified that he is employed by the Los Angeles Galvanizing Company and is currently the president. That company galvanizes steel using the hot dip method. After the galvanizer's ash is skimmed off, there is no further use for it in the galvanizing process. Rosenkranz testified that the primary process is putting zinc onto the steel; galvanizer's ash is a byproduct.

Frank Williams, manager of engineering at Calwest Galvanizing Corporation, testified that his firm uses the hot dip method, in which galvanizer's ash or zinc ash is formed by the reaction of air on the surface of the hot zinc. It does not use the zinc ash in its processes.

David Richardson, plant manager for Davis-Walker Corporation, which produces steel wire and wire products, testified that it uses a hot dip process. It has sold zinc oxide to LCC. The company does not need the zinc oxide, nor does it try to make it.

James Short testified that he is employed at Anchor Post Products as plant manager. This company has sold galvanizer's ash to LCC. Before it sold its galvanizer's ash to LCC, its employees took it to the dump.

Galvanizer's ash met the criteria for hazardous waste set forth in former title 22, chapter 30, articles 9 and 11 of the California Administrative Code. Garrett admitted that the material was almost pure zinc or zinc oxide. Indeed, LCC expects the galvanizer's ash to be at least 70 percent zinc by weight. This certainly exceeds the .5 percent level set by state regulations to render it hazardous.

*Ball mill fines*

Ball mill fines result from the crushing of galvanizer's ash; when the metallic zinc is removed, the zinc oxide, in powder form, is what remains. It is a residue of the ball mill process.

LCC's own tests show the zinc content to be over 74 percent by weight and the lead content to be over 1 percent by weight, both well above the criteria set by the state regulations.

*Sal skimmings*

This flux is a residue removed during the galvanizing process.

Rosenkranz, Short and Richardson each testified that his firm sells sal skimmings to LCC. Sal skimmings were not primary products of each's manufacturing process; in particular, Short noted that this was another material that had been taken to the dump until LCC expressed interest in it.

Garrett testified that the zinc content in the sal skimmings is sometimes as high as 80 to 90 percent by weight. Garrett's tests show the sal skimmings to average 58.28 percent zinc by weight; average lead content was .22 percent by weight, both correlating to levels above the state regulations.

*Zinc sulfate/nickel solution*

Patricia E. Sones testified that she is the process control supervisor at Yates Company, a company which manufacturers copper foil. This compa-

ny uses zinc and copper sulfate solutions in its manufacture process, which is plating a copper sulfate solution on a stainless steel drum. Sometimes the company plates a zinc solution onto the surface of the raw copper. Once it accidentally mixed nickel into the zinc plating. It tried to take it out but could not. It allowed LCC to take the material away just for the cost of the transportation.

Leu testified that zinc sulfate solution fits the definition of a recyclable material as a "spent material" which specifically includes plating solutions.

The zinc sulfate solution that LCC received from Yates either met or exceeded the specified level for hazardousness.

*Zinc baghouse fume dust*

Zinc baghouse fumes are primarily zinc oxide. The dust formed is a residue of the melting process.

The dust has an average zinc content of over 51 percent by weight and lead content of over 1 percent by weight, both above the levels set by the state regulations.

*Zinc hydroxide (filter cake)*

Williams testified that before Calwest Galvanizing Corporation sold its "pickle liquor"-produced zinc hydroxide to LCC, it was forced to haul it to a dump in Beatie, Nevada.

Robert Schultze is the plant manager of Triange PWC Incorporated, which manufactures electrical conduit by electroplating 10-foot lengths of steel tubing with zinc. The manufacturer does not use the filter cake, which is produced from the rinse waters through the electroplating system. The "filter cake is what is formed by what we remove from the water." It is approximately 8 to 15 percent zinc. This material had been sold to LCC.

The filter cake, whether removed from the pickle liquor or the rinse water, is no longer used in the galvanizing process. It is thus a residue of that process. Garrett admitted that the material is usually over 10 percent zinc by weight. The average zinc content is over 16 percent by weight, well above the limits set in the state regulations.

*K016*

Steel mill flue dust, classified as a hazardous waste by RCRA, was LCC's chief raw material before 1985. The contents of the six surface impound-

ments located on LCC's site are largely the residual slurry left over from LCC's process of mixing sulfuric acid with the K016 to make fertilizer. The slurry then is a residue of the fertilizer manufacturing process. Garrett admitted that it is a residue. Approximately 30,000 tons of the slurry remains in LCC's 6 surface impoundments.

State samples taken of the slurry had levels of zinc, lead, and cadmium in excess of state standards.

### C.

### No Exemption Is Available for LCC's Raw Materials

Health and Safety Code section 25124, subdivision (d) provides that a material is a waste if it is recycled, accumulated, stored or treated before recycling, except as provided in Health and Safety Code section 25143.2. This section provides for numerous exemptions from that definition. ▇ However, overriding any potential exemption is the language found at Health and Safety Code section 25143.2, subdivision (e) (prior to a 1989 amendment, listed as subdivision (c) with the same content), which provides in relevant part: "[A]ll of the following recyclable materials are subject to the requirements of this chapter which apply to hazardous waste. [¶] (1) . . . Any material used in a manner constituting disposal of the material, or any material used to produce a product that is applied to the land as a fertilizer, soil amendment, agricultural mineral, or an auxiliary soil and plant substance."

DHS considers LCC's zinc as not qualifying for an exemption since it is both used in a manner constituting disposal and used for making fertilizer.

DHS does not define the term "used in a manner constituting disposal." It uses the definition contained in EPA's regulations.

Since LCC's entire business operation was the production of agricultural fertilizer, and this fact alone overrides any claim of exemption here, whether the substances were also "used in a manner constituting disposal" does not matter. DHS appropriately determined that no exemption was available based upon the nature of appellants' product.

### IV.

### Liability of Garrett

Garrett was found personally liable for the $250,000 fine with the court below holding, "Dr. Garrett owns at lease [sic] a part of the facility and is,

therefore, an owner. As president and only corporate officer, Dr. Garrett is clearly 'the person responsible for the overall operation' of the Hanford facility and is, therefore, an operator. Dr. Garrett is therefore individually responsible for ensuring compliance with HWCA."

Health and Safety Code section 25187 defines "person" to include individuals, corporations, and other business or public entities. That section goes on further to provide in part: "Persons who are subject to an order pursuant to this section include present and prior owners, lessees, or operators of the property where the hazardous waste is located, . . ."

At the time of the administrative hearing, former title 22 of the California Administrative Code, sections 66146 and 66144 defined "owner" to mean "the person who owns a facility or part of a facility" and "operator" to mean "the person responsible for the overall operation of a facility." Here, since even a nonowner operator is subject to liability, our determination that substantial evidence supported the finding that Garrett was the "operator" makes it unnecessary for us to decide whether evidence of the corporation's ownership and funding also supported a finding Garrett was an "owner."

Suffice it to say, the record supports the conclusion that Garrett himself was aware shortly after the hazardous waste regulations went into effect that he faced personal liability for failure to comply. He testified that five other shareholders of the corporation sold out to him to avoid personal liability. "I, on the other hand, had put essentially all of my capital into the company and didn't feel it was possible for me to bail out. So I, in turn, bought out the other stock holders and became the sole officer of the company and sole director to reduce liabilities on anybody else."

As to his day-to-day participation in the business, Garrett testified, "It's a small company and I more or less act as a chief administrative officer, the manager, and technical representative of the company." There was no evidence that anyone other than he had any authority or control over the operation of LCC.

In *People* v. *Martin*, *supra*, 211 Cal.App.3d 699, likewise involving an HWCA proceeding although not administrative in nature, the president and principal operating officer of the Chem-O-Lene Company, Ray Martin, was criminally prosecuted for directing his employees to unlawfully dispose of hazardous waste. That court upheld the imposition of felony probation, a fine of $75,000 and a mandatory penalty assessment of $52,500. The *Martin* court cited *United States* v. *Park* (1975) 421 U.S. 658 [44 L.Ed.2d 489, 95

S.Ct. 1903] for the proposition that a company's president as a corporate agent could be held individually liable in a criminal action. There, Park was charged with failing to maintain the corporation's food products in a sanitary condition. (*People* v. *Martin, supra,* at p. 715.)

Garrett counters that *Martin* is not even remotely on point since it was a criminal case. However, the critical concern here is whether the parties responsible under the HWCA scheme include persons such as Garrett. Whether a proceeding is criminal, civil, or administrative in nature does not vary the meaning of terms such as "corporate agent" or "operator."

*United States* v. *Johnson & Towers, Inc.* (3d Cir. 1984) 741 F.2d 662 was a case in which the court, in construing language similar to former California Administrative Code title 22, sections 66146 and 66144, determined that the language "any person" included individual employees who exercise primary control even though they may not actually be owners or operators of the company.

In *United States* v. *Northeastern Pharmaceutical* (8th Cir. 1986) 810 F.2d 726, the court found that the definition of "person" under RCRA included corporate officers and employees who actually made the corporate decisions. That court noted "imposing liability upon only the corporation, but not those corporate officers and employees who actually make corporate decisions, would be inconsistent with Congress' intent to impose liability upon the persons who are involved in handling and disposal of hazardous substances." (*Id.* at p. 745.)

Similarly, here we have little doubt that the state Legislature by enacting HWCA intended to impose liability on those individuals personally responsible for decisions relative to the management of hazardous waste.

Garrett additionally argues that the imposition of the fine against him personally is a strict liability result and is prohibited by *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30 [127 Cal.Rptr. 122, 544 P.2d 1322]. In that case, the court construed Water Code section 13350, subdivision (a), which included three subparts, each prohibiting certain acts. Subdivisions (1) and (2) provided that a showing of intent or negligence was necessary for a finding that a violation had occurred. Subdivision (3) was silent on that point. The court concluded that to impose strict liability for one offense and require intent or negligence for the others would create disharmony in the statute. The court thus construed subdivision (3) as imposing liability for negligently or intentionally causing or permitting a violation. (*People* ex rel. *Younger* v. *Superior Court, supra,* at p. 42.)

The *People* ex rel. *Younger* court did not hold that a strict liability statute would be unacceptable if that had been the intent of the Legislature. Certainly the Legislature has the authority to enact malum prohibitum provisions for which no intent or negligence is required. The new provisions of HWCA applied here were part of such an enactment intended to impose a portion of the hazardous waste cleanup costs upon those responsible for the problem, with the further intent to mitigate the cost and danger to the public.

### DISPOSITION

The judgment of the superior court is affirmed. Respondent is awarded its costs on appeal.

Stone (W. A.), Acting P. J., and Franson, J.,* concurred.

---

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.