[S.F. No. 23322. In Bank. Feb. 4, 1976.]

THE PEOPLE ex rel. EVELLE J. YOUNGER,
as Attorney General, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
BOARD OF PORT COMMISSIONERS OF THE
CITY OF OAKLAND et al., Real Parties in Interest.

## COUNSEL

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Roderick Walston, William M. Chamberlain, Gregory K. Wilkinson and Richard C. Jacobs, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

J. Kerwin Rooney, Gerald P. Martin, Jr., Charles Negley, Maloney, Chase, Fisher & Hurst and Joseph D. Ryan for Real Parties in Interest.

Lillick, McHose & Charles, Frederick W. Wentker, Jr., and Gary P. Snyder as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**SULLIVAN, J.**—The People, on the relation of the Attorney General and of the California Regional Water Quality Control Board, San Francisco Region (Regional Board) seek a writ of mandate directing respondent superior court to vacate its order granting judgment on the pleadings and its pretrial order in the underlying action for the imposition of civil penalties pursuant to section 13350, subdivision (a)

(3), of the Water Code.[1] Essentially we are called upon to construe the foregoing statute and to determine (1) whether the civil liability provided for therein may be imposed upon a public entity; (2) whether such liability may be imposed without fault or requires proof of negligence or intent; and (3) whether the maximum $6,000 per day liability may be imposed for each day the oil referred to in the statute remains in the state waters or only for each day that it is deposited therein.

The facts in brief are these: On January 19, 1973, 125,000 gallons of oil were discharged into the waters of the Oakland Estuary from oil storage tanks located on real property owned by real party in interest Board of Port Commissioners of the City of Oakland (Port of Oakland). The tanks and the oil stored therein were owned by real parties in interest Port Petroleum Co., Purity Oil Sales, Inc., Economy Refining Service Co., Inc., dba Pacific Petroleum Co., and Michael D. Marcus. The oil discharge occurred when unknown persons entered upon the property and opened valves on the tanks and connecting pipes.

Following three days of hearings, the Regional Board found the facts to be as stated above, concluded that the failure to surround the tanks with a wall and to provide adequate security as a protection against intruders was a contributing cause of the oil discharge, and that the Port of Oakland and the owners of the tanks were responsible under section 13350, subdivision (a) (3), for causing or permitting oil to be deposited in the waters of the state. Accordingly, the Regional Board requested the Attorney General to take appropriate action.

On June 7, 1973, through the Attorney General, the People (hereafter plaintiff) brought the underlying action for civil penalties against real parties in interest (hereafter defendants). On May 16, 1975, following

---

[1] Subdivision (a) of section 13350 of the Water Code provides: "Any person who (1) intentionally or negligently violates any cease and desist order hereafter issued, reissued, or amended by a regional board or the state board, or (2) in violation of any waste discharge requirement or other order issued, reissued, or amended by a regional board or the state board, intentionally or negligently discharges waste or causes or permits waste to be deposited where it is discharged into the waters of the state and creates a condition of pollution or nuisance, or (3) causes or permits any oil or any residuary product of petroleum to be deposited in or on any of the waters of the state, except in accordance with waste discharge requirements or other provisions of this division, may be liable civilly in a sum of not to exceed six thousand dollars ($6,000) for each day in which such violation or deposit occurs."

Water Code section 13050 provides in pertinent part: "As used in this division: ... (c) 'Person' also includes any city, county, district, the state or any department or agency thereof. ... "

Hereafter, unless otherwise indicated, all section references are to the Water Code.

argument on cross-motions for summary judgment and on defendants' motions for judgment on the pleadings, respondent court granted the motion of defendant Port of Oakland for judgment on the pleadings "for the reason that Water Code section 13350 imposes liability primarily for the sake of example and by way of punishment, and the defendant Port is immune from such liability pursuant to Government Code section 818." The court denied the motions for judgment on the pleadings of the remaining defendants and also denied all motions for summary judgment and partial summary judgment made by all of the parties. On May 28, 1975, respondent court issued a pretrial order governing the prosecution of the action against the remaining defendants in the case in which it directed that in order to establish the liability of said defendants under section 13350, subdivision (a) (3), plaintiff must prove that they negligently or intentionally caused or permitted an oil spill and further determined that such section imposes liability only for each day that oil enters the waters of the state and not for each day that oil remains on the waters before being removed. At the same time the court entered a judgment of dismissal as to defendant Port of Oakland.

Plaintiff thereupon filed the instant petition. We issued an alternative writ of mandate, having determined that " 'there is no adequate remedy in the ordinary course of law and that [this] case is a proper one for the exercise of our original jurisdiction.' [Citations.]" (*Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661, 663 [105 Cal.Rptr. 785, 504 P.2d 1249].)

We turn to the merits. Government Code section 818 provides: "Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant."[2] This section was added to the code upon the recommendation of the California Law Revision Commission, which commented: "*Public entities should not be liable for punitive or exemplary damages. . . .* " (Recommendation Relating to Sovereign Immunity, 4 Cal. Law Revision Com. Rep. (Jan. 1963) p. 817.) Damages which are punitive in nature, but not "simply" or solely punitive in that they fulfill "legitimate and fully justified compensatory functions," have been held *not* to be punitive damages within the meaning of section 818

---

[2] Civil Code section 3294 provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

of the Government Code. (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 13, 14-16 [84 Cal.Rptr. 173, 465 P.2d 61]; *State Dept. of Corrections* v. *Workmen's Comp. App. Bd.* (1971) 5 Cal.3d 885 [97 Cal.Rptr. 786, 489 P.2d 818].)

In *Helfend* we observed that while the collateral source rule[3] may be punitive in nature in that it requires a wrongdoer to pay damages for an injury for which compensation may have been made in whole or in part, it is not simply, that is solely, punitive. This is so, we pointed out, since the rule "embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift." (2 Cal.3d at pp. 9-10.) We reasoned that the rule not only expressed a policy of encouraging persons to purchase and maintain insurance for personal injuries but also effectuated a closer approximation to a full compensation for them. Accordingly, we held that these legitimate and important functions of the collateral source rule, which are compensatory in nature, dictate that damages awarded in tort cases where the plaintiff has been compensated by an independent collateral source, should not be classified as punitive within the meaning of section 818 of the Government Code. We concluded that "[i]n view of the several legitimate and important functions of the collateral source rule in our present approach to the law of torts and damages, we find no appropriate justification for labelling the rule 'punitive' or for not applying it to public entities and public employees . . . ." (2 Cal.3d at p. 16.)

In *State Dept. of Corrections* this court held that the provision in Labor Code section 4553 to the effect that compensation recoverable by an employee for an industrial injury shall be increased by one-half if he is injured by reason of the serious and wilful misconduct of the employer, does not award punitive damages within the meaning of section 818 of the Government Code. Again we noted that the rule is punitive in nature in that the employer "is required to pay a higher amount of compensation by reason of his serious and wilful misconduct than he would have been compelled to pay if his conduct were less culpable" (*State Dept. of Corrections* v. *Workmen's Comp. App. Bd., supra,* 5 Cal.3d 885, 890) but that it is not simply, that is solely, punitive because it does not result in an award greater than full compensation for the injury. We concluded

---

[3] In *Helfend* this court defined the collateral source rule as "the doctrine that if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d at p. 6.)

that since the increased award for wilful misconduct of the employer is not "beyond the equivalent of harm done" but rather "contemplates more fully compensating the plaintiff for an industrial injury rather than penalizing the employer, we hold that the award made here does not violate section 818 of the Government Code." (*Id.,* at p. 891.)

■ Plaintiff concedes that the civil liability imposed by section 13350, subdivision (a) (3), is punitive in nature in that it seeks to deter oil spills in state waters and, by making it costly to be held responsible for them, to impress upon the public the necessity of taking every precaution against their occurrence. However, plaintiff contends that such liability is not solely punitive as it fulfills legitimate compensatory functions.[4] In the first place, such civil liability compensates the people of the state for the unquantifiable damage which an oil spill causes; and secondly, the money recovered as a result of the imposition of the liability is used to aid in cleaning up and abating the pollution of state waters. As to plaintiff's first point, it is clear, we think, that the damage resulting from the deposit of oil in state waters is by its very nature unquantifiable. The harm caused not only to the waters themselves but to the wildlife and marine life dependent upon them as well as its pervasive and continued effect defies a general assessment of damages to say nothing of their calculation in terms of money.[5] Thus the moneys collected civilly

[1] Defendant Port of Oakland contends that the punitive nature of the damages awarded for violation of section 13350, subdivision (a) (3) was conclusively determined in *People* ex rel. *Cal. Reg. W. Q. C. Bd.* v. *Department of Navy* (1973) 371 F.Supp. 82. In that case the Attorney General brought an action against the Department of Navy asserting liability under such section for an oil spill into the waters of San Francisco Bay. The court held that the Department of Navy was immune under federal law because the asserted liability was punitive rather than compensatory, relying on *Missouri Pacific R. Co.* v. *Ault* (1921) 256 U.S. 554 [65 L.Ed. 1087, 41 S.Ct. 593]. The applicable federal standard, unlike the California standard set forth in *Helfend* and *State Dept. of Corrections* which provides immunity only if the damages are simply punitive, grants immunity to the federal government for damages "which do not merely compensate" (*Ault, supra,* at p. 564), or where the "impact of [the] section is more punitive than compensatory." (*People* ex rel. *Cal. Reg. W. Q. C. Bd.,* at p. 85.) Since the federal standard for ascertaining punitive damages for federal government immunity purposes varies so significantly from the California standard, the case is inapposite.

Defendant Port of Oakland repeatedly points to the punitive aspects of section 13350, subdivision (a) (3), liability. The liability imposed by that section is undoubtedly punitive in nature and indeed is conceded to be so by plaintiff. However, the critical question is whether it is simply, that is solely, punitive.

[5] It would seem incontrovertible that the environmental damage caused by a substantial oil spill contains many elements of undoubtedly real damage that are unquantifiable. The possible nature and extent of this unquantifiable damage was set forth by the United States Supreme Court in *Askew* v. *American Waterways Operators, Inc.* (1973) 411 U.S. 325, 333, fn. 5 [36 L.Ed.2d 280, 286-287, 93 S.Ct. 1590]: "As to the

pursuant to section 13350, subdivision (a) (3), operate to more fully

damages of oil spills to ecological factors it was recently said in 10 Harv. Int'l L. J. 316, 321-323 (1969):

'Some damage to marine life is obvious in the wake of a disaster such as the one which befell the "Torrey Canyon." Surface feeding fishes die when they swim into floating oil, and even slight, non-fatal contact may render their flesh inedible. Shellfish, among others, are also vulnerable to oil pollution. When the tanker "P.W. Thirtle" grounded off Newport, Rhode Island, 31,000 gallons of heavy black oil were discharged from her tanks in an effort to refloat the ship; the result of this was the virtual destruction of the entire oyster fishery of Narragansett Bay. The most serious consequences of oil pollution, however, may not be those which are immediately obvious.

'According to Dr. Erwin S. Iversen, a marine biologist:

' "The greatest problem may be the toxic effects on the intertidal animals that serve as food for the other more important fishes. . . . I don't think the effect is merely that of killing large populations of commercial fishes. Worse than that, it interrupts the so-called food chain."

'There have been few specific studies of the effect that oil accumulation has on this food chain. One study, conducted by Dr. Paul Galtsoff of the United States Fish and Wildlife Service, found that the diatoms on which oysters feed will not grow where there is even a slight trace of oil on the water. The effect of oil on such microscopic marine plant life may be of great importance, because it is estimated that it takes as much as ten pounds of plant matter to produce one pound of fish.

'Large scale oil pollution, such as that which occurred when the "Torrey Canyon" ran into the Seven Stones Reef, results in huge losses of water birds. Aside from humane and aesthetic considerations, these birds play a vital role in the ecology of the seashore, a role which profoundly affects the fishing industry. The uncertainty as to the actual extent of the damage done to marine life by oil pollution makes it difficult to estimate the economic effect of such damage, but the importance of the fishing industry within the world's economy is not in doubt and is steadily increasing. Between 1958 and 1963, for example, there was a 42% rise in the world catch. Because of the increasing importance of seafood protein, future damage to marine life will have progressively greater economic consequences.

'Perhaps the most noticeable damage caused by oil pollution is the fouling of recreational beaches and shorefront property. One-half million tons of oil are washed ashore each year, rendering beaches unfit for swimming and filling the air with unpleasant odors. Besides the annoyance that this causes a vacationing public seeking relief from urban life, economic loss may be considerable. It is estimated, for example, that a serious oil spill off Long Island during the summer months would cost resort and beach operators thirty million dollars. Oil spills also create navigational and fire hazards in harbors, ports and marinas.' (Footnotes omitted.)"

The nature of the difficulty in quantifying this damage—what is the value of a seagull, of benthic organisms which possess miniscule intrinsic value but have a crucial importance in man's food chain—is suggested by the following excerpt from the Wall Street Journal (Sept. 2, 1975, at p. 1):

"Los Angeles-Economist Walter Mead, addressing an offshore oil conference, is discussing the 'social cost' of the 1969 Santa Barbara oil spill. He quickly arrives at a knotty question: What is the cost, in dollars and cents, of one dead sea gull?

"Taking a lunge at it, he puts the figure between $1 and $10. 'I don't think anyone would say they have a value of more than $10 a bird,' he reasons. But he hasn't asked environmentalists.

"While the oilmen in the audience remain silent, the environmentalists stare at each other in pained disbelief. A murmuring fills the room and one environmentalist voices agreement with the notion that economists 'know the price of everything and the value of nothing.' The next day Jacques Cousteau, the oceanographer, assails the Mead analysis as 'shocking' because each species is 'precious in itself.' "

compensate the people of this state and are not beyond an amount equivalent to the harm done.[6]

As to plaintiff's second point, section 13441, subdivision (c), provides that all money collected pursuant to section 13350 shall be paid into the State Water Pollution Cleanup and Abatement Account (§ 13440), which pursuant to section 13442 may be paid to a public agency "to assist it in cleaning up the waste or abating its effects on waters of the state." It is thus clear that all damages collected under section 13350 subserve the compensatory purpose of alleviating the harm done by persons violating the section since all moneys collected civilly may be used to assist a public agency in cleaning up waste or abating its effects on waters of the state. We therefore conclude that the civil penalties imposed pursuant to such section are not simply and solely punitive in nature but fulfill legitimate compensatory functions and are not punitive damages within the meaning of Government Code section 818 so as to preclude the recovery of such moneys against public entities.[7] (*State Dept. of Corrections* v. *Workmen's Comp. App. Bd., supra,* 5 Cal.3d 885; *Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, 13-16.)

We now turn our attention to the pretrial order delimiting the issues in the action against the remaining defendants. We emphasize that

---

[6]Defendant Port of Oakland contends that section 13350, subdivision (a) (3), clearly contemplates recovery beyond the equivalent of the harm done because section 13350, subdivision (d), provides that remedies under section 13350 "are in addition to, and do not supersede or limit, any and all other remedies, civil or criminal." However, the mere fact that the maximum $6,000 per day liability imposed by section 13350, subdivision (a) (3), can be imposed in addition to civil liability for actual damage caused does not necessarily mean that the damages are therefore simply punitive in nature because, as the plaintiff urges, much of the harm resulting to the people from oil spills is intangible and unquantifiable and therefore cannot be recovered in an action for actual damage. To the extent that such damages, although real, are unquantifiable, the function of liability imposed by section 13350, subdivision (a) (3), is to more fully compensate the People just as under Labor Code section 4553 the employer's increased liability for wilful misconduct is to more fully compensate the employee. (See *State Dept. of Corrections* v. *Workmen's Comp. App. Bd., supra,* 5 Cal.3d 885, 891.)

[7]The California Law Revision Commission indicated that it was inappropriate to subject a public entity to liability for punitive damages since such damages are imposed for wrongdoing (oppression, fraud, malice) and the impact falls not on the wrongdoer (public entity or public employee) but upon the innocent taxpayer. (4 Cal. Law Revision Com. Rep., *supra,* p. 817.) This court pointed out in *Helfend* that this is not the case where the public entity incurs liability as the result of its maintaining an enterprise due to the fact that tort "recoveries are the normal cost of maintaining an enterprise, and represent no grievous injury to taxpayers since the entity and its insurer are in an excellent position to spread the risk of loss and to take precautionary measures to prevent injuries." (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d 1, 8-9, fn. 9.) Defendant Port of Oakland is clearly an enterprise.

what we say in connection with the pretrial order will of necessity apply to defendant Port of Oakland upon the vacation of the judgment of dismissal entered in its favor and the ensuing reinstatement of said defendant in the underlying action. The trial court ruled that in order to establish liability under section 13350, subdivision (a) (3), plaintiff must prove that defendants *negligently* or *intentionally* caused or permitted oil to be deposited on state waters and that if so such liability may be imposed according to the terms of the statute for each day that oil was deposited on state waters but not for each day that it remained there. Plaintiff on the other hand contends that the above statute imposes strict liability—that is liability without regard to fault or intent—and that such liability is imposed anew for each day the oil remains on the waters. As we explain *infra*, these contentions are without merit.

We have been unable to find, and the parties have not referred us to, any legislative history or reported decisions dealing with the standard of fault prescribed by subsection (3) of section 13350, subdivision (a) (see fn. 1, *ante*). "Therefore we must interpret the statute in question in accordance with applicable rules of statutory construction, fundamental among which are those which counsel that the aim of such construction should be the ascertainment of legislative intent so that the purpose of the law may be effectuated [citation]; that a statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts [citation]; and that courts should give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citation.]" (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33].)

 The problem of statutory construction which we face focuses more upon the structure of the relevant provisions than their meaning. If the clause creating liability for deposits of oil were not preceded by an arabic numeral ("3"), indicating a subsection and referring the reader directly back to the original introductory subject ("Any person who"), then it would have been a part of the series of verbs found in subsection ("2") with its own verbs ("causes or permits") modified by the immediately preceding adverbs "intentionally or negligently." Indeed that is exactly how the Legislative Counsel's digest of the bill introducing the statute reads: "Provides that any person who in violation of any waste discharge requirement or other order issued, reissued, or amended by a California regional water quality control board or the State Water

Resources Control Board, *intentionally or negligently discharges waste or causes or permits waste to be deposited* where it is discharged into the waters of the state and creates a condition of pollution or nuisance, or *causes or permits any oil or any residuary product of petroleum to be deposited* in or on any of the waters of the state . . . ." (Leg. Counsel's Dig. of Sen. Bill No. 225 (1971 Reg. Sess.); italics added.) If the statute actually read as described by the legislative counsel, that is without the subsection division, then according to normal English usage the adverbs "intentionally or negligently" would modify the whole series of verbs ("discharges waste . . . or causes or permits waste to be deposited . . . or causes or permits any oil . . . to be deposited") so that only one who intentionally or negligently causes or permits oil to be deposited in the waters of the state would be liable. However, with the addition of the numeral (3), denoting a subsection, the statute according to conventional usage would literally read: "Any person who . . . (3) causes or permits any oil . . . ."

Plaintiff contends that the Legislature deliberately chose not to repeat the adverbs "intentionally or negligently" in describing the standard of fault for oil deposits and accordingly by its use of the words "any person who . . . causes or permits any oil . . ." intended to prescribe a standard of strict liability, that is to say one of absolute liability without regard to fault. Defendant Port of Oakland contends that it is unreasonable to construe that language as prescribing strict liability because the Legislature knows very well how to impose liability without fault if it so desires. Defendants direct our attention to the fact that in the very same session in which it enacted section 13350, subdivision (a) (3), the Legislature enacted a strict liability statute governing oil spills by owners or operators of oil tankers: "Where damage arises out of . . . the acts of an owner or operator . . . any owner or operator of any vessel engaged in the commercial transportation of petroleum or fuel oil shall be *absolutely liable without regard to fault* for any property damage incurred . . . caused by the discharge or leakage of petroleum or fuel oil from such vessel into or upon the navigable waters of the state." (Harb. & Nav. Code, § 293; italics added.) We find the point persuasive. In view of the imposition of strict liability for oil spills in Harbors and Navigation Code section 293 in explicit and precise words, and in light of the structure of section 13350, subdivision (a) outlined above, it seems to us unreasonable to conclude that the same Legislature dealing with a related subject, by its use of merely the words "causes or permits" in subsection (3) of the latter statute intended to impose strict liability.

Moreover, the imposition of strict liability in the statutory context of section 13350, subdivision (a), would create disharmony and inconsistency in the total statutory scheme. Harbors and Navigation Code section 151 provides: "Except where permitted pursuant to the provisions of . . . the Water Code, any person who intentionally or negligently causes or permits any oil to be deposited in the water of this state . . . shall be liable civilly in an amount not exceeding six thousand dollars ($6,000) and, in addition, shall be liable to any governmental agency charged with the responsibility for cleaning up or abating any such oil for all actual damages, in addition to the reasonable costs actually incurred in abating or cleaning up the oil deposit in such waters. . . ."

In the light of this last mentioned section, a determination that section 13350, subdivision (a) (3), imposes strict liability would result in the anomalous situation that a faultless spiller of oil would be subjected to a greater civil penalty than an intentional spiller of oil (a $6,000 maximum *for each day* in which a deposit occurs as compared with a $6,000 *flat* maximum for each deposit) although the former would not be liable for the cost of cleanup or for actual damage caused. If, however, section 13350, subdivision (a) (3), is construed to apply only to persons who *intentionally* or *negligently* cause or permit oil to be deposited, then all oil spillers, with the exception of the special class of oil tanker owners or operators governed by section 293 of the Harbors and Navigation Code, would be subject to the same standard of liability.

Therefore we conclude that the legislative purpose can best be effectuated in harmony with the total statutory scheme governing oil deposits in state waters by construing section 13350, subdivision (a) (3), as imposing liability for *intentionally* or *negligently* causing or permitting oil spills. It would appear that the Legislature inserted the numeral "3," thereby creating a subsection governing deposits of oil, not to effect a different standard of liability for deposits of oil as opposed to deposits of waste, but rather to indicate the change in subject matter, namely from waste discharge to oil deposit. In so doing it failed to recognize that syntax and the structure of the entire subdivision required repetition of the adverbs "intentionally or negligently" so as to denote with clarity the intended standard of liability. We hold that the trial court correctly ruled that plaintiff must prove that defendants intentionally or negligently caused or permitted the oil deposit in order to establish their liability under section 13350, subdivision (a) (3).

█ Finally, we turn our attention to the extent of the liability imposed. The trial court ruled that the relevant portion of the statute

imposes liability in a sum not to exceed $6,000 for each day that the oil *enters* the waters. Plaintiff contends that the section imposes liability for each day that the oil *remains* on the waters. The statute (see fn. 1, *ante*) provides in pertinent part: "Any person who . . . causes or permits any oil . . . to be deposited in or on any of the waters of the state . . . may be liable civilly in a sum of not to exceed six thousand dollars ($6,000) *for each day in which such violation or deposit occurs.*" (Italics added.) In the context of the full section, it is clear, and the parties agree, that the word "violation" does not refer to deposits of oil, so that the critical word is "deposit." To put it in other words, anyone who causes or permits oil to be deposited in the waters of the state may be liable for each day in which such "deposit occurs."

■ Mindful of the principles of statutory construction set forth earlier, we note additionally that where the principal problem of construction concerns the meaning of words used in the statute, we must look first to the words themselves (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1]) and must interpret them "according to the usual, ordinary import of the language employed in framing them" (*In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]; see also *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 203 [339 P.2d 801].)

■ We start with the words themselves, "deposit occurs." Webster's Third International Dictionary, Unabridged (1963) defines the noun *"deposit"* in pertinent part as follows: "4: the act of depositing . . . 5a: something laid, placed, or thrown down; *esp*: matter deposited by some natural process . . ." and defines the verb *"occur"* in pertinent part as "1. to be found or met with: Appear . . . 2: to present itself: to come to pass: take place: HAPPEN. . . ."

Combining and coordinating these definitions, we apprehend that the statutory clause under examination supports two meanings, "for each day in which such": (1) act of depositing takes place or (2) matter placed down is found. Since the language used by the Legislature could support either meaning urged by the parties, the pertinent clause cannot be construed on a purely linguistic basis and resort must be had to the principles of statutory construction adverted to earlier in this opinion.

If the statute is construed to impose liability for each day that the oil remains on the water (i.e. "the matter placed down is found"), then the liability is measured by a critical factor normally beyond the control of the violator, namely the time in which the oil spill is or reasonably can

be cleaned up. This factor, however, does not relate directly to the degree of culpability. Certainly the state has every right to be concerned about the problems engendered by the size of the spill, the cost of the clean-up and the length of time the spill persists. However, this concern is already adequately dealt with by Harbors and Navigation Code section 151 which subjects any person who intentionally or negligently deposits oil in the waters of the state to liability "for all actual damages, in addition to the reasonable costs actually incurred in abating or cleaning up the oil deposit in such waters." Since this latter statute, already in effect at the time section 13350, subdivision (a), was enacted, provides a direct and adequate remedy for the cost of oil spill clean-up, it is reasonable to assume that the Legislature had a different purpose in mind when it enacted the civil penalties provision in section 13350, subdivision (a) (3), covering the act of depositing itself. This conclusion is buttressed by the added consideration that section 151 of the Harbors and Navigation Code already imposed a civil penalty for such act of depositing, but placed a maximum limit on the penalty of $6,000. Thus a significant fact emerges: when the Legislature enacted section 13350, subdivision (a) (3), it increased the civil penalty for the same act to a maximum of $6,000 *per day*.

It appears to us that the Legislature by enacting section 13350, subdivision (a) (3), was concerned with persons who caused oil spills day after day—in other words, with persons who intentionally or negligently caused oil to be deposited regularly or over a period of time. By imposing an additional penalty for each day that the person continues to deposit the oil in the waters, the Legislature provides an effective deterrent to continuous or chronic violations.

Therefore, since a construction of the pertinent clause of section 13350, subdivision (a) (3), as imposing liability for each day that a person deposits oil in the waters of the state is not only consistent with the ordinary meaning of the words themselves but also is in harmony with the overall statutory scheme, and since additionally such a construction effectuates the legislative purpose of penalizing continuous acts of depositing oil, we hold that section 13350, subdivision (a) (3), imposes liability in a sum not to exceed $6,000 for each day in which oil *is deposited* in the waters of the state and not for each day during which such oil *remains* in the waters. We uphold the trial court ruling to this effect.

We therefore reach these final conclusions: First, that petitioner (plaintiff below) is entitled to a peremptory writ of mandate directing

respondent court to vacate its order granting real party in interest Board of Port Commissioners of the City of Oakland (defendants below) judgment on the pleadings and to vacate its judgment of dismissal as to said defendant, and further to vacate its pretrial order of May 28, 1975, insofar as such order rules that said defendant is immune from liability for any violation of section 13350, subdivision (a) (3), by reason of section 818 of the Government Code; and, second, that petitioner is not entitled to such a writ directing respondent court to vacate such pretrial order in the other respects sought by petitioner.

Let a peremptory writ of mandate issue in accordance with the views herein expressed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.

Petitioners' application for a rehearing was denied March 3, 1976.