[No. B173716. Second Dist., Div. Three. Oct. 21, 2004.]

LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION
AUTHORITY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JERROLD J. LYONS, Real Party in Interest.

**COUNSEL**

Gibeaut, Mahan & Briscoe, Gary Robert Gibeaut, Sally G. Kushner and John W. Allen for Petitioner.

No appearance for Respondent.

ACLU Foundation of Southern California, Martha Matthews and Peter Eliasberg as Amicus Curiae on behalf of Respondent.

Duran & Thomas, Jeffrey S. Thomas and Carol L. Newman for Real Party in Interest.

**OPINION**

**CROSKEY, J.**—Government Code section 818 provides: "Notwithstanding any other provision of law, a public entity is not liable for damages awarded

under section 3294 of the Civil Code[1] or other damages imposed *primarily for the sake of example and by way of punishing the defendant.*"[2] In this writ proceeding, we are asked to address the novel question of whether section 818 precludes the award of the civil penalty specified in the Unruh Civil Rights Act (Civ. Code, § 51 et seq. [Unruh Act]) for the violation of certain of its provisions.

After the petitioner, Los Angeles County Metropolitan Transportation Authority (MTA), was sued by the real party in interest, Jerrold J. Lyons (Lyons), for, among other things, a violation of the Unruh Act, it moved to strike Lyons's claim for recovery of the Unruh Act's statutory civil penalty of $25,000. The MTA argued that such civil penalty was barred by section 818. The trial court denied the motion and the MTA then sought writ relief in this court.

After a review of the relevant statutory provisions (including related legislative history) and case law, we conclude that the trial court correctly determined that the civil penalty sought by Lyons is not barred by section 818. We therefore will deny the MTA's petition for a writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 21, 2002, Lyons was riding an MTA bus traveling down Santa Monica Boulevard in West Hollywood. The bus driver made a series of taunting, derogatory and homophobic remarks directed at Lyons. The taunting continued until the bus reached Lyons's stop at La Cienega Boulevard. As Lyons moved to leave, the driver gestured to blow him a kiss "in a deliberately humiliating and demeaning fashion." Lyons slapped the driver on his way out of the bus. The driver then grabbed Lyons by the backpack, forcibly restrained him, and began beating him severely. The driver knocked Lyons to the ground and continued to restrain, beat, and kick him and pull his hair. The driver was six feet four inches tall and weighed about 280 pounds. Lyons was five feet nine inches tall and weighed 135 pounds.

Eventually, after bus passengers and other bystanders helped to separate the driver from Lyons, Lyons gathered his belongings and escaped. After boarding the bus again and driving a short distance, the driver caught up with Lyons, left the bus to chase him on foot, and resumed beating him. Lyons's resulting injuries included: a broken rib, clumps of hair torn from his scalp, a laceration to his head, a hyper-extended knee, abrasions over much of his body, and other injuries.

---

[1] Civil Code section 3294 provides for exemplary damages in "an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice . . . ."

[2] We hereafter refer to Government Code section 818 simply as section 818.

On August 20, 2003, Lyons filed this action against MTA, the driver, and a number of Doe defendants. He alleged causes of action for assault, battery, false imprisonment, intentional infliction of emotional distress, negligence, and violation of the Unruh Act against all defendants. In the allegations under the Unruh Act, Lyons charged violations of Civil Code section 51.7.[3] In addition to other remedies, Lyons requested the enforcement of a $25,000 civil penalty for each offense alleged, as provided by Civil Code section 52(b)(2).[4]

On October 2, 2003, the MTA filed a motion to strike the allegations supporting Lyons's claim for a civil penalty under the Unruh Act, as well as the related portions of the prayer. It argued that the "motion [was] made and based upon the grounds that statutory civil penalties under the Unruh Act cannot be imposed against a public entity defendant." The MTA also argued that given the similarity of Lyons's complaint to a standard tort claim against a public entity, and given the absence of citation to any detailed regulatory statute, the provision regarding statutory civil penalties constituted punitive damages and, therefore, was not available against MTA.

A hearing was held on the matter on January 9, 2004. Following argument by the parties, the trial court indicated it believed that the $25,000 civil penalty allowed by the Unruh Act was not really to "penalize the county or set up the county as an example. But this is basically to somehow make whole the victim of this act that is prohibited." The court thus concluded that the primary purpose of the $25,000 penalty was to make whole, not to punish. Accordingly, the trial court denied the MTA's motion. The MTA then filed this petition for writ of mandate. Due to the novelty of the factual context in which this issue was raised by MTA's petition, we issued an order to show cause and set the matter on calendar.

---

[3] Civil Code section 51.7, guarantees freedom from violence or intimidation. That section reads in relevant part: "(a) All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, *sexual orientation*, age, disability, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. . . . [¶] . . . [¶] (b) *As used in this section, 'sexual orientation' means heterosexuality, homosexuality, or bisexuality.*" (Italics added.)

[4] Civil Code section 52, subdivision (b) provides, in relevant part: "Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following: [¶] (1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages. [¶] (2) A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, . . . [¶] (3) Attorney's fees as may be determined by the court."

## CONTENTIONS OF THE PARTIES

MTA argues that it is a public entity and section 818 precludes the imposition of any civil penalty under the Unruh Act because, in the context of this case, such penalty constitutes punitive or exemplary damages. MTA contends that there is only a narrow exception to the operation of section 818. Under that exception, MTA argues, civil penalties may be imposed against public entities, *only* where the state has set up a comprehensive regulatory scheme and seeks to impose penalties for violations of those regulations against entities subject to the regulation, whether public or private. MTA argues that the Unruh Act is not such a comprehensive regulatory scheme, but rather has broad application to prevent discrimination against California citizens and therefore, such "narrow exception" has no application in this case.

Lyons disputes this argument and contends that, under the plain language of the Unruh Act, the civil penalty does not constitute punitive or exemplary damage, but rather was intended to and does serve other public purposes including the award of a minimum compensation to the victim of a defendant's discriminatory conduct. Thus, the civil penalty specified in Civil Code section 52, subdivision (b)(2), does *not* offend the provision in section 818 declaring that, to be prohibited, a damage award must be "imposed *primarily* for the sake of example and by way of punishing the defendant." (Italics added.) This construction of the Unruh Act's civil penalty, Lyons argues, is fully consistent with the legislative history of section 818 and prior relevant case law.

## DISCUSSION

### 1. Standard of Review.

The standard of review for the denial of a motion to strike punitive damages allegations is de novo. (*Cryolife, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1145, 1157 [2 Cal.Rptr.3d 396].) Given that MTA's argument rests on the proposition that the Unruh Act civil penalty constitutes a prohibited punitive damage and should therefore be stricken, it is appropriate that we apply the same standard of review in this case. (See also *Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253, 1255 [79 Cal.Rptr.2d 747].)

### 2. The Unruh Act Makes a Clear Distinction Between Punitive Damages and a Civil Penalty.

In the Unruh Act, the Legislature expressly provided that a successful plaintiff was entitled to recover (1) his or her *actual* damages (Civ. Code,

§ 52, subd. (b)); (2) exemplary damages to be determined by the jury (or the court sitting without a jury), (Civ. Code, § 52, subd. (b)(1)); (3) a civil penalty of $25,000 to be awarded for a denial of the right specified in section 51.7 (Civ. Code, § 52, subd. (b)(2)); and (4) attorney's fees as may be determined by the court (Civ. Code, § 52, subd. (b)(3)).

The first thing that one notices about these statutory provisions is that the Legislature has authorized *both* an award of punitive damages *and* an award of a civil penalty. Plainly, the Legislature regarded these as *separate* remedies. Further, the civil penalty is to be awarded to the successful plaintiff in the sum of $25,000. The statute leaves the court (or jury) with no discretionary choice, contrary to the other three bases of recovery. The "actual" damages that plaintiff is entitled to recover depend upon proof of their existence and amount. The "amount" of punitive damages (including the option to award zero) is left to the discretion of the trier of fact (whether court or jury) and the award of attorney's fees is left to the trial court's discretion. The civil penalty, however, *must* be awarded in the sum of $25,000 provided a plaintiff has proven a violation of section 51.7. Put another way, if plaintiff establishes that he or she was a victim of the condemned discriminatory conduct, then his or her *minimum* recovery will be $25,000.

By separately providing for exemplary damages *and* a civil penalty, the Legislature obviously intended for the two categories of relief to be distinct from one another. For section 818 to apply to the civil penalty remedy specified in Civil Code section 52, subdivision (b)(2),[5] its remedial purpose would need to be *"primarily* for the sake of example and by way of punishing the defendant" (italics added); in other words, substantially the same purpose as the remedy provided in section 52, subdivision (b)(1).

But a construction that these two subdivisions serve the same remedial purpose would be unacceptable for at least two reasons. First, it would render one or the other superfluous. Under settled principles of statutory interpretation, however, "a construction that renders a word surplusage should be avoided." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 799 [268 Cal.Rptr. 753, 789 P.2d 934]; *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].)

Second, it would tend to create double recoveries. So long as no double recovery results, a plaintiff may recover multiple remedies in tort for damages arising from the same conduct by the defendant. (See 6 Witkin, Summary of

---

[5] Unless otherwise stated, all statutory references are to the Civil Code (other than the previously defined Gov. Code, § 818).

Cal. Law (9th ed. 1987) Torts, § 1334, p. 792.) For example, in appropriate cases, punitive damages and statutory civil penalties may be awarded in the same action. (*Greenberg v. Western Turf Ass'n.* (1903) 140 Cal. 357, 364 [73 P. 1050]; *Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, 169 [100 Cal.Rptr.2d 662].) Multiple damage awards are authorized in various areas of the law, and they may reflect different social objectives. (*Marshall v. Brown* (1983) 141 Cal.App.3d 408, 419 [190 Cal.Rptr. 392].) But where the social objectives pursued by two categories of damages sought in one cause of action are the same, an award for both would create a double recovery. In *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218 [220 Cal.Rptr. 712], the court refused to allow punitive damages under section 3294 and a civil penalty for breach of warranty by a mobilehome manufacturer provided for elsewhere in the Civil Code on the grounds that the two requested remedies each served to punish and make an example of the defendant. The court reasoned that if the Legislature had intended to allow awards for punitive damages and a civil penalty in the same cause of action, "it would in some appropriate manner have said so." (*Id.* at p. 228.) In this case, of course, by expressly providing for both exemplary damages and a civil penalty in section 52, subdivision (b), the Legislature has "said so."

■ We must presume the Legislature intended neither to create an impermissible double recovery nor to include surplus language in the statute. Therefore, we have no trouble concluding that section 52, subdivision (b)(2), establishes a separate remedial category that is distinct from the exemplary damages provided for in section 52, subdivision (b)(1).

3. *The Legislative History of the Unruh Act Demonstrates a Legislative Emphasis on the Nonpunitive Element of the Civil Penalty Provision*

Some version of section 52 has been on the books since 1905 when it provided a specified monetary remedy for certain violations of California's public accommodations law. For example, it stated that any person who denied another's rights to full use and enjoyment of public accommodations in the state because of race or color would be liable in damages for an amount of not less than $50. Over the years, the section has been amended to (1) add types of public accommodations and amusements that were subject to the law, (2) increase the statutory minimum recovery, (3) add protected groups, (4) differentiate the remedies for different types of violations, (5) allow for enforcement by public prosecutors, and (6) change the remedy from solely a statutory minimum recovery to a civil penalty awarded over and above actual damages.

For most of the last century, the code sections now known collectively as the Unruh Act were written so as to punish all denials of civil rights in public accommodations alike. In other words, the law provided civil enforcement to protect all citizens' equal rights to full participation in society, and it made little difference how such rights might be denied. Today, however, the law recognizes that when a violation is committed through violence or intimidation, different rights are violated and different remedies are required. The Ralph Civil Rights Act of 1976 (§ 51.7) specifies, in particular, that all persons in the state have a civil right to be free from violence and intimidation targeted against individuals because of their actual or perceived membership in a particular social group. The Legislature simultaneously added section 52, subdivision (b), to provide multiple special remedies for this very different class of violations.

Section 52, subdivision (b), took its current shape over the course of amendments in the 1980's and 1990's. Until 1986, section 52, subdivision (b), provided that whoever violated another person's civil rights under section 51.7 would be liable for actual damages plus a $10,000 civil penalty. In 1986, the Legislature amended the statute to make violators additionally liable for an amount determined by the fact finder not to exceed three times actual damages. The statute was amended again in 1989 to clarify that the $10,000 civil penalty was payable directly to the plaintiff.[6] According to the Senate Judiciary Committee's report on the bill, the purpose of this amendment was to "make it easier for Ralph Act victims to file civil law suites [*sic*] and for private attorneys to represent them." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 531 (1989–1990 Reg. Sess.).) A Senate Judiciary Committee fact sheet also stated: "Current Ralph Act remedies are limited for Ralph Act victims, discouraging them from vindicating their rights. Providing clearly in SB 531 that the penalty goes to the victim will make it easier for Ralph Act victims to file civil law suits and for private attorneys to represent them. At present, very few Ralph Act cases are filed with either the Department of Fair Employment and Housing, the administrative agency which takes these cases, or in court. Thus, the fiscal effects to the state of changing the penalty to go to the victim are anticipated to be negligible." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 531 (1989–1990 Reg. Sess.).) The Assembly Judiciary Committee meanwhile produced its own analysis of the bill which stated: "[B]ecause the statutory language failed to specify to whom the $10,000 civil penalty was to be awarded, some confusion has arisen as to whether the state rather than the victim should be given the $10,000 penalty. It is argued that this bill is necessary to eliminate that confusion." (Assem. Com. on Judiciary,

---

[6] There had been some uncertainty expressed as to whether the state could assert a claim to the civil penalty award. The 1989 amendment ended that uncertainty.

Rep. on Sen. Bill No. 531 (1989–1990 Reg. Sess.).) This history clearly demonstrates that the Legislature intended to provide increased compensation for plaintiffs and to encourage private parties to file lawsuits under the statute.

In response to an increase in hate crimes, the Legislature again amended the bill in 1991. In Senate Bill No. 98 (1991–1992 Reg. Sess.), the cap on punitive damages to be awarded by the fact finder under section 52, subdivision (a), was removed. The expectation apparently was that, in appropriate cases, large exemplary damage awards would contribute to shutting down or severely deterring the illegal activities of organized hate groups. In addition, the amendment increased the civil penalty under section 52, subdivision (b)(2), from $10,000 to $25,000 to reflect the increase in the Cost of Living Index; and deleted a provision which provided that the civil penalty be prorated among multiple offenders so as to punish each individually and to avoid rewarding those committing hate crimes in concert with others by permitting them to pay a lower monetary penalty than offenders acting alone. The bill also amended the penal code to increase the maximum criminal penalty for perpetrators of certain hate crimes.[7]

According to the report the Senate Judiciary Committee prepared at the time, the purpose of these amendments was "to provide more effective remedies for victims of hate motivated crime and violence." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 98 (1991–1992 Reg. Sess.).) The bill was expected to "enable more victims of hate violence to pursue redress through the filing of civil rights actions." (*Ibid*). The Senate Rules Committee report contained substantially the same analysis. Finally, speaking on behalf of the bill before the Assembly Subcommittee on the Administration of Justice, a representative of the Fair Employment and Housing Commission stated, "Minority communities throughout the state are also clamoring for civil actions be brought [*sic*] against the perpetrator to obtain renumeration [*sic*] for victims' injuries. Passage of SB 98 also sends a message that the Legislature and the state view civil hate crimes cases as seriously or more seriously than any other tort." (Sen. Subcom. on Admin. of Justice, Rep. on Sen. Bill No. 98 (1991–1992 Reg. Sess.).)

It is apparent from this legislative history that section 52 has at least two important nonpunitive purposes. The first is simply to provide increased compensation to the plaintiff. The second purpose, and perhaps the more important one, is to encourage private parties to seek redress through the civil

---

[7] In addition, Senate Bill No. 98 introduced civil rights training as a component of California attorneys' mandatory continuing legal education requirement for the purposes of ensuring a level of knowledge of civil rights law among members of the bar, increasing the pool of attorneys willing and able to represent hate crime victims, and to increase awareness of the civil and criminal penalties which are available to deter hate crime activity.

justice system by making it more economically attractive for them to sue. A concern had been raised repeatedly that the civil penalties were insufficient and that hate crime victims were not taking advantage of them, very likely owing to the fact that some victims suffered little actual damages. If not for the civil penalty, many such litigants would neither have the economic incentive, nor the means to retain counsel to pursue perpetrators under the statute. Under the current wording of section 52, subdivision (b)(2), the civil penalty clearly provides a minimum compensatory recovery even in those cases where the plaintiff can show little or no actual damages.

Although the only portion of the statute that is directly relevant to the case at hand is subdivision (b)(2) (which provides for the civil penalty), it is also appropriate to consider it in some context. When examined in the context of the other amendments, including the enhancement of criminal penalties, removal of the cap on punitive damages, and mandatory civil rights education for attorneys, it is clear that the current version of section 52, subdivision (b)(2), is part of a larger body of law designed to further a clear legislative intent to have the civil rights laws taken seriously and be vigorously enforced by encouraging private parties to litigate such claims. Acceptance of MTA's argument that section 818 grants it immunity in this area would defeat this important component of the anti-hate crime legislation.

This history reinforces our conclusion that the civil penalty of section 52, subdivision (b)(2) is not *solely* punitive. While it may have some punitive characteristics, it clearly serves to advance the Legislature's intent to encourage and aid private parties to help in enforcing the civil rights laws by bringing civil suits against perpetrators of hate crimes. The civil penalty also helps to ensure that plaintiffs receive ample compensation, irrespective of their *actual* damages. Because of these important *nonpunitive* remedial functions, section 52, subdivision (b)(2), does not fall within the scope of government immunity under section 818. To hold otherwise would compromise private parties' ability to litigate claims under section 51.7 and thus undercut the legislative intent behind providing a statutory recovery to which plaintiffs are automatically entitled upon proof of liability, regardless of actual damages. This conclusion is also fully supported by relevant case law dealing with the application of section 818 in different factual contexts.

4. *The Unruh Act's Civil Penalty Is Not Imposed "Primarily" For Punishment.*

As already noted, section 818 provides: "Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed *primarily* for the sake of example and by way of punishing the defendant." (Italics added.) Limiting

government immunity to damages that are "primarily" punitive reflects the reality that a single damages category may serve multiple remedial purposes. Most civil penalties are necessarily punitive to some extent in that they aim to deter misconduct and may lead to recoveries in excess of an otherwise available measure of compensation. Given the language of section 52, subdivision (b), however, civil penalties are not punitive for section 818 purposes *if some other remedial aim predominates.* Indeed, a number of courts have concluded that to be condemned as punitive, a penalty, generally speaking, must *simply* and *solely* serve that purpose. While there are no cases directly on the issue of public entity immunity from civil penalties under the Unruh Act, there are several instructive decisions which discuss the immunity provided by section 818 in other civil penalty contexts.

In *Helfend v. Southern California Rapid Transit District* (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61], the Supreme Court upheld application of the collateral source rule and refused to allow the Rapid Transit District, a public entity, to reduce a damages judgment by means of collateral payments to the injured party from an independent source on the grounds that the collateral source rule was not penal in its effect. The court reasoned that the rule expressed a policy of encouraging private investment in insurance for personal injuries and brought plaintiffs closer to full compensation. Because of these compensatory functions, the court held that application of the rule should not be classified as punitive for section 818 purposes. (At p. 16.)

In *State Department of Corrections v. Workmen's Comp. Appeals Board* (1971) 5 Cal.3d 885 [97 Cal.Rptr. 786, 489 P.2d 818] (*Department of Corrections*), the Department of Corrections argued that section 818 made it immune from enforcement of an increased worker's compensation award for willful misconduct provided for in the Labor Code. Though the award was concededly punitive in part in that the employer was "required to pay a higher amount of compensation by reason of his serious and wilful misconduct than he would have been compelled to pay if his conduct were less culpable," the court upheld the award because it was not "simply and solely" punitive in that it also served to provide fuller compensation to an injured employee. (*Id.* at pp. 886–891.) "Although an employer against whom an increased award is made under section 4553 [of the Labor Code] is penalized in the sense that he is required to pay a higher amount of compensation by reason of his serious and wilful misconduct than he would have been compelled to pay if his conduct were less culpable, the employee does not receive more than full compensation for his injuries. Thus, the increased award is not a penalty in the sense of being designed primarily to punish the defendant rather than to more adequately compensate the plaintiff." (*Id.* at p. 890.)

The issue in *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30 [127 Cal.Rptr. 122, 544 P.2d 1322] (*Younger*) was whether section 818

permitted civil penalties for oil spills provided for in the Water Code to be enforced against the Port of Oakland, a public entity. The court concluded that because the civil penalties were compensatory as well as punitive, they were not punitive for section 818 purposes and therefore could be recovered from a public entity. (At pp. 35–39.) The defendant Port pointed to the fact that the Water Code section involved served in part to punish and make an example of wrongdoers. (*Id.* at p. 37.) But the court chose to overlook the punitive aspect of the penalties, reasoning that "[t]he liability imposed by that section is undoubtedly punitive in nature and indeed is conceded to be so by plaintiff. However, *the critical question is whether it is simply, that is solely, punitive.*" (*Id.* at p. 37, fn. 4, italics added.) Although civil liability imposed by the Water Code was admittedly punitive in that it sought to deter oil spills, the damages collected also served a compensatory purpose since they compensated for the unquantifiable damage caused by oil spills and defrayed some of the costs of cleaning up waste and abating further damages. Thus, the court held that the penalties were not "simply and solely punitive" and thus did not constitute punitive or exemplary damages within the meaning of section 818. (*Id.* at pp. 37–39.) In the case immediately following *Younger*, *San Francisco Civil Service Association v. Superior Court* (1976) 16 Cal.3d 46 [127 Cal.Rptr. 131, 544 P.2d 1331], the court applied the same reasoning and again framed the issue as "whether the civil penalties [. . .] for discharging pollutants are *simply and solely punitive in nature* or fulfill compensatory functions so as to remove them from the class of punitive damages covered by section 818 of the Government Code." (*Id.* at p. 50, italics added.)

In *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139 [279 Cal.Rptr. 318, 806 P.2d 1353] (*Kizer* ), the court considered whether section 818 prevented the state from imposing statutory civil penalties under the Health and Safety Code on a state-licensed, county-operated long-term health care facility. The court stated: "Nowhere in the Tort Claims Act does the Legislature indicate an intention to immunize public entities from monetary sanctions authorized by the Legislature and imposed for failure to observe minimum health and safety standards adopted to protect and prevent injury to patients. Granting immunity to public entities from the penalties would be contrary to the intent of the Legislature to provide a citation system for the imposition of prompt and effective civil sanctions against long-term health care facilities in violation of the laws and regulations of this state." (*Id.* at p. 146.)

Similarly, nowhere in the Tort Claims Act does it say that public entities should be immune from civil penalties that the Legislature has deemed necessary for the effective enforcement of civil rights laws and effective compensation of victims. As the *Kizer* court put it, " '[g]iven the unquestionable importance of this legislative purpose [assuring a uniform standard of quality health care], we perceive no significant public policy reason to

exempt a state licensed health-care facility from liability for penalties under the Act simply because it is operated by a public rather than a private entity, even though it is the taxpayer who ultimately bears the burden when such penalties are imposed on a publicly owned facility. The citation and penalty provisions of the Act serve to encourage compliance with state mandated standards for patient care and to deter conduct which may endanger the well-being of patients. City councils and county boards of supervisors are as likely as private entities to heed the threat of monetary sanctions and make certain that their facilities are operated in compliance with the law.' " (*Kizer, supra,* 53 Cal.3d at p. 150.)

MTA argues that the real effect of *Kizer* is that it established a "narrow exception" to section 818 and it will apply only when the civil penalty is part of a "comprehensive regulatory scheme" and government entities are subject to the regulation. It is true that the civil penalties at issue in *Kizer* were part of what could be called a comprehensive regulatory scheme which applied to public and private hospitals alike. (*Kizer, supra,* 53 Cal.3d at p. 143.) It does not appear, however, that the mere fact that the civil penalties were part of a regulatory scheme was central to the *Kizer* court's reasoning. In our view, the critical reason the penalties were sustained by the *Kizer* court, despite their punitive aspect, was that they served a *compensatory* function, and their primary purpose was "to secure obedience to statutes and regulations imposed to assure important public policy objectives." (*Id.* at pp. 147–148.) The fact that the civil penalty played these nonpunitive roles did not depend on the fact that the civil penalties were contained in a comprehensive body of regulations. Moreover, MTA's argument ignores the principle endorsed by *Department of Corrections* and *Younger* that section 818 does not bar remedies that are not "simply and solely" punitive.

A recent California case on section 818 immunity is *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049 [134 Cal.Rptr.2d 358] (*Marron*). *Marron* involved enhanced civil penalties for dependent elder abuse alleged against the Regents of the University of California for acts committed by doctors and staff of the UCSD Medical Center. The enhanced penalties came in the form of attorney fees and decedent pain and suffering payable to the survivors in a wrongful death action upon proof of reckless neglect. Arguing that the enhanced penalties were punitive, the Regents asserted section 818 immunity and won a motion for summary adjudication at trial. The *Marron* court reversed, however, reasoning that the award of pain and suffering damages to survivors after death was compensatory, not punitive, because it did not result in compensation in excess of the harm caused. (*Marron, supra,* 108 Cal.App.4th 1049, 1062.) Further, and consistent with *Department of Corrections* and *Younger,* the court held that the attorney fee provision was not punitive for section 818 purposes because it was intended to act as an incentive to attorneys to represent clients in elder abuse cases.

■ Clearly, section 818 does shield the state from punishment simply for the sake of punishment. There are good reasons for this rule. As explained in *McAllister v. South Coast Air Quality etc. Dist.* (1986) 183 Cal.App.3d 653 [228 Cal.Rptr. 351], parties bearing the burden of the award—the citizens— are the same group who are expected to benefit from the public example which the punishment makes of the wrongdoer; and it would be improper to allow plaintiffs to introduce evidence of a government defendant's wealth because this would allow plaintiffs to introduce evidence of public entities' unlimited power to tax. (*Id.* at p. 660.) Where, as here, however, the amount of the civil penalty is fixed by the statute, the defendant's wealth is irrelevant, thus eliminating one major public policy reason for section 818's grant of immunity. More importantly, where enforcement of a civil penalty against public entities serves to spur the achievement of important public policy objectives, the law withholds immunity. (*Kizer, supra,* 53 Cal.3d at pp. 147–148.) For example, section 818 was held not to be a defense in a case where the Legislature enacted penalties for the purposes of spurring private enforcement of the laws and ensuring full compensation. (*Department of Corrections, supra,* 5 Cal.3d at pp. 889–890).

■ "Government Code section 818 was not intended to proscribe all punitive sanctions." (*Kizer, supra,* 53 Cal.3d at p. 146.) Rather, damages which are "punitive in nature," but are not "simply or solely" punitive in that they fulfill legitimate and fully compensatory functions, have been held *not* to be punitive damages within the meaning of section 818 so as to preclude their enforcement against public entities. (*Id.* at p. 145; *Younger, supra,* 16 Cal.3d at pp. 35–36.) As the above discussed cases make clear, the immunity afforded to public entities under section 818 is narrow, *extending only to damages whose purpose is simply and solely punitive or exemplary.*

As this case plainly illustrates, there are distinctions to be drawn between *punitive* damages and civil penalties. The latter often do more than just punish, and they are not awarded on the same basis as pure punitive damages. For example, in *Beeman v. Burling* (1990) 216 Cal.App.3d 1586 [265 Cal.Rptr. 719], the issue was whether a San Francisco municipal ordinance that trebled actual damages for wrongful eviction conflicted with section 3294 in that it deprived the fact finder of discretion to award punitive damages or not and permitted the penalty without proof of oppression, fraud, or malice. In the court's opinion, the challenge was flawed because it erroneously equated punitive damages with statutory penalties. (At p. 1597.) In upholding the penalty, the court reasoned that "while both exemplary damages and statutory damages serve to motivate compliance with the law and punish wrongdoers, they are distinct legal concepts, one of which is entrusted to the factfinder, the other to the Legislature." (*Id.* at p. 1598.) In *Kelly v. Yee* (1989) 213 Cal.App.3d 336, 342 [261 Cal.Rptr. 568], a case upholding the same San Francisco ordinance, the court reasoned that although it was

"punitive in nature," the treble damages provision's main purpose was to "promote effective enforcement of the ordinance on behalf of low-income tenants."

In *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721, 731–733 [128 Cal.Rptr.2d 542] (*First Federal*), we discussed some of the fundamental differences between the two classes of remedies. For one, most civil penalties (including section 52, subdivision (b)(2)) are mandatory once liability is established, whereas punitive damages are awarded at the fact finder's discretion only, upon proof of fraud, oppression, or malice. (*Id.* at p. 732; *see Pelletier v. Eisenberg* (1986) 177 Cal.App.3d 558, 564–565 [223 Cal.Rptr. 84] [" 'A plaintiff, upon establishing his case, is always entitled of right to compensatory damages. But even after establishing a case where punitive damages are permissible, *he is never entitled to them* . . . . [Even] [u]pon the clearest proof of malice in fact, it is still the exclusive province of the jury to say whether or not punitive damages shall be awarded.' " [Citation].].) As Lyons correctly notes in his brief, a court cannot award punitive damages if the plaintiff has suffered no actual damages. (*Mother Cobb's Chicken Turnovers, Inc. v. Fox* (1937) 10 Cal.2d 203, 205 [73 P.2d 1185]; *see also Kizer, supra,* 53 Cal.3d at p. 147 ["In California, as at common law, actual damages are an absolute predicate for an award of exemplary or punitive damages."].) On the other hand, a civil penalty, like the one in section 52, subdivision (b)(2), does not expressly require that the plaintiff suffer any actual damages.

Indeed, as we have explained, the civil penalty mandated by section 52, subdivision (b)(2), appears designed to ensure that the plaintiff will receive at least a minimum amount of compensation, even though there are little or no actual damages sustained. In *First Federal,* we also noted that the standard of proof required for each remedy is different. Civil penalties are awarded upon a showing of liability by a preponderance of the evidence, whereas punitive damages require "clear and convincing evidence" of fraud, oppression, or malice. (*First Federal, supra,* 104 Cal.App.4th at p. 732.) We further observed that where, as here, the amount of the civil penalty is set, the problem of limitless jury discretion is eliminated. (*Id.* at p. 733.) Finally, we held that whereas an award of punitive damages cannot be sustained absent meaningful evidence of the defendant's financial condition (see, e.g., *Adams v. Murakami* (1991) 54 Cal.3d 105, 110–112 [284 Cal.Rptr. 318, 813 P.2d 1348]), such evidence is not required for the class of civil penalties at issue in that case. (*Ibid.*; *see also Rich v. Schwab* (1998) 63 Cal.App.4th 803, 816–817 [75 Cal.Rptr.2d 170].)

## *DISPOSITION*

The petition for a writ of mandate is denied. The order to show cause issued on March 30, 2004 is discharged. Lyons shall recover his appellate costs in these writ proceedings.

Klein, P. J., and Aldrich, J., concurred.